1

2

3

4

5

6

7

8

9     IN THE UNITED STATES DISTRICT COURT

10    FOR THE EASTERN DISTRICT OF CALIFORNIA

11 DEWAYNE NOLAN LOGAN,

12    Petitioner,     No. CIV S-05-CV-0785 GEB CHS

13   vs.

14 D.L. RUNNELS,

15    Respondent.    FINDINGS AND RECOMMENDATIONS

16 _____/

17       **I.  INTRODUCTION**

18    Petitioner, DeWayne Nolan Logan, is a state prisoner proceeding pro se with a

19 petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving an

20 indeterminate sentence of forty-one years to life imprisonment following his jury conviction in the

21 Sacramento County Superior Court for second degree robbery with penalty enhancements for

22 personally using a firearm and for five prior convictions.  During his trial, Petitioner entered a plea

23 of no contest to one count of inducing a person to give false testimony.  Petitioner presents various

24 claims challenging the constitutionality of his convictions.

25      **II.  CLAIMS FOR REVIEW**

26    Petitioner sets forth six grounds for relief in his pending petition.  Specifically, the

claims are as follow, verbatim:

(1)   Trial court allowed a[n] impermiss[i]bly suggestive voice line-up in court.  In violation of Petitioner's right [ ] [to] due process.

(2)   Improper denial of Motion for Judgment of Acquital.  Which violates due process provided by U.S. Constitution.

(3)   Refusal to provide defense with juror contact information in regard to juror impropriety claim(s).

(4)   False evidence was material in securing Petitioner's conviction which violates Petitioner's right of equal protection.

(5)   Failure to disclose impeachment evidence in response to defense request.  In violation of [Petitioner's] right [ ] [to] due process and right of confrontation.

(6)   Loss of material evidence.  Denial of due process ability to put forth a complete defense using all evidence.

(Pet. at 7-12.)  Based on a thorough review of the record and applicable law, it is recommended that the each of Petitioner's claims be denied.

## III. BACKGROUND

The basic facts of Petitioner's crimes were summarized on direct appeal by the California Court of Appeal, Third Appellate District, as follows:

*Prosecution's Case*

On the morning of May 11, 2000, Sacramento Sheriff's Sergeant Ron Bozworth drove his personal van to an apartment complex for a matter unrelated to this case.  At about 7:30 a.m., he saw a red or maroon Oldsmobile Cutlass park[ed] at a street corner, facing him.  The car had no front license plate, but did have a plate on its dashboard.  Once the car parked, the two men inside got out.  They seemed nervous and immediately began looking around, "as if someone was looking at them."  It was May, but one of the men was wearing a parka and the other was wearing a ski hat.  In contrast, Bozworth, who was on his way to work, was wearing a T-shirt and blue jeans, and he was not cold although the windows of his van were rolled down.  The two men crossed the street toward Bozworth, the driver coming within 30 feet of him and the passenger coming within 35 to 40 feet of him.  The driver was a light-skinned black man, about 20 to 25 years old, who was about six feet one inch tall, weighing 190 pounds, wearing what appeared to be a ski cap with curly hair coming

2

from underneath it.  He had a sparse mustache, was wearing light blue athletic pants with a white stripe, and athletic shoes.  The passenger was a black adult male, darker skinned, with very short, cropped hair, a thick mustache, about six feet one inch tall, weighing 220 pounds, wearing a dark parka, dark blue athletic pants with a white stripe, and athletic shoes.  The men headed eastbound on Marconi Avenue and disappeared from view.  The Greyhound Bus Depot was nearby in the 2600 block of Marconi.

A short while later, while Bozworth was still trying to observe them, the men came running westbound and entered their car.  The car immediately started up and proceeded south across Marconi.  It failed to stop at a stop sign and proceeded past Bozworth's van.  Based on his observations and 16 years of experience, Bozworth suspected the men had just committed a robbery.  The men were suspicious because "they were looking around as if someone was watching them.  Their eyes were very wide open, as if they were scared."  Their behavior was consistent with armed robbery because they parked at a distance so their car could not be seen.

Bozworth pursued the car for several blocks and telephoned its description and license plate number to other officers.  Eventually, he lost sight of the car.

At 7:51 a.m. that morning, Sacramento Police Officer Joseph Pane was on duty in a marked patrol car.  He heard a broadcast stating that the suspect car contained a black male in his twenties and a black male in his forties.  The broadcast included the car's license plate number.  Pane obtained the registered owner's address on Erickson Street, drove to that location and found the car parked in the driveway.  As Pane waited for other officers to arrive, he saw defendant walk across the driveway between the car and a fence.  Defendant walked past Pane, reached El Camino Avenue, and continued walking westbound.  Pane stopped defendant, pat-searched him, placed him in the patrol car and drove him back to the Erickson Street address.  Defendant denied that he had come from the residence and denied knowing anything about the red Oldsmobile.  Shortly thereafter, codefendant Marcus Newson left the house and approached Pane at his request.  Newson denied knowing defendant and Pane placed him in the patrol car.  Pane asked Newson if he had been out in the Oldsmobile that morning and Newson stated he had been at his sister's residence on Edison Avenue.  Other officers arrived and entered the Erickson Street residence.

Earlier that morning, Ronald Egenhoff was working in his office at the Greyhound Bus Depot on Marconi.  At about 7:30 a.m., while Egenhoff was doing paperwork in his back office, he heard someone in the lobby yell "hey."  Egenhoff left the office and found two men at the ticket counter.  The younger man was about 20 years old, about five feet nine inches tall, wearing a large black jacket and hood.  Egenhoff could not see his hair.  The older man was about 40 years

3

old, about five feet ten inches tall and about 190 pounds.  He was wearing a light-colored beanie cap with dreadlocks protruding from beneath it.  The older man suddenly pulled out a small "reddish-colored" gun and pointed it at Egenhoff.  Egenhoff became frightened, and the older man began shouting that he was going to rob him.  The older man ordered Egenhoff to open the cash drawer and give him all the money, shouting, "Hurry, hurry, hurry, or I'm going to shoot you."  Egenhoff opened the main cash register, which contained $242, consisting of mostly ones, fives and some tens.  Egenhoff avoided looking at the older man's face and looked down as soon as the man pulled the gun.  The older man then asked if there was another register and ordered Egenhoff to open it up.  Egenhoff opened a smaller register and gave the older man about $21.  The older man then demanded to know the location of the safe.  Egenhoff returned to his office, opened the safe and handed the older man the money, which consisted of two "drops," one of $130 and the other of $120.  The older man told Egenhoff to lie down and he complied.  The men rushed out the door.  A few seconds later, Egenhoff looked out and saw the men running toward an apartment complex building lot.  Egenhoff went to a neighboring business and asked a patron, Nathaniel Sutton, to call 911; Sutton had already done so.

Sheriff's deputies arrived and obtained a statement from Egenhoff, who stated that the older robber had a "heavy mustache."  Egenhoff was then driven to Erickson Street where he viewed two suspects.  The younger man (Newson) was brought toward Egenhoff.  He was not wearing a hooded ski jacket, and Egenhoff was unable to positively identify him.  Egenhoff believed the robber was a little bit darker skinned than the suspect, but he was "similar in build and size."  The lighting in the office consisted of fluorescent tubes whereas the suspect was viewed in very bright sunshine.

The deputies then brought an older man (defendant) to the front of the patrol car and Egenhoff was unable to positively identify him as the older robber.  Egenhoff explained that he "expected him to have the same thing on" and "expected him to have hair," but the older man being shown looked bald.  Egenhoff noted that the older man was "[v]ery similar to the height and build" of the older robber.  In examining the face, Egenhoff concluded defendant looked "close" and "looked familiar," but he could not say it was the same person for sure.  Egenhoff was shown, but he could not identify, a green ski jacket that had been found in the back seat of the Oldsmobile.  But when the jacket was reversed, Egenhoff identified it as "the exact type jacket" the younger robber was wearing.  Egenhoff believed it was the same jacket.  Later, deputies brought Egenhoff close to defendant and showed Egenhoff a strand of hair on the side of defendant's head.  Egenhoff came to believe that defendant was the person who had robbed him.  He was "[a]bout 89 percent" sure of his identification.

A search of defendant's pants pockets revealed $263 in various

denominations.  A search of Newsom's pants pockets revealed $141 in various denominations and keys that unlocked the Oldsmobile, which was registered to him.

A search of the Erickson Street residence revealed a pair of blue nylon sweatpants with gold and white stripes along the side.  The pants were in a trash can with some trash on top of them.

In a field behind the house, deputies found a white plastic sack tied in a knot.  The sack was fairly new and "looked out of place" among the weeds.  Inside the sack were an auburn or reddish-coloreed long wig, a bronze handgun-shaped cigarette lighter, and a blue knit cap.  The wig was shedding and it had shed inside the knit cap.  Defendant had close, cropped hair with only about four days' worth of growth.  However, auburn or reddish wig fibers were recovered from defendant's head, ear and shoulders.  Three fingerprints found on the plastic sack did not match defendant or Newson.

At trial, Egenhoff was shown a handgun-shaped cigarette lighter and identified it as the "gun" that was pointed at him.  There were "[n]o dissimilarities" between the "gun" he saw during the robbery and the item shown to him at trial.

Also at trial, Egehoff reported that defendant, who was proceeding in propria persona and had questioned Egenhoff, had a voice similar to that of the older robber.  Defendant provided a voice sample in which he stated, "Hey, hurry."  Egenhoff opined that defendant's voice was "[v]ery similar" to the robber's, although he "wouldn't say absolutely that's the voice."

LaQuanda McKenzie was staying at the Erickson Street house along with Debra Foster; Foster's son, Newson; and defendant, Foster's boyfriend.  The house belonged to Foster.

At about 5:45 a.m. the morning of the robbery, while McKenzie was in a living room chair, Newson entered, got some window cleaner, and took it outside to wash his car.  After doing so, Newson returned to the living room and asked defendant if he was "ready to roll."  Defendant replied, "Let's go, man," and the two left together.  McKenzie heard two car doors slam and the car drive off.

McKenzie recalled that Newson was wearing blue sweatpants with a yellow and white stripe and a hooded black jacket with green lines or stripes.  She identified the sweatpants from the trash can as the ones Newson had been wearing.  She also identified the jacket from the Oldsmobile as Newson's jacket.  She had previously seen Newson wear it with the black side outward.

McKenzie recalled that defendant was wearing jeans, a dark jacket, a black or navy blue beanie, and sunglasses.  She identified the beanie found in the plastic sack as the one defendant had been

wearing.  She also identified the jacket from the Oldsmobile as defendant's jacket.  McKenzie identified the wig found in the sack as the one she had seen in the backseat of the Oldsmobile.

McKenzie testified that about one and one-half to two hours after leaving, defendant and Newson returned to the house.  Newson was still wearing the hooded coat and blue pants but he soon changed into a pair of tan pants.  He went outside still wearing the jacket.  McKenzie told a detective that when she saw Newson five minutes later he was no longer wearing the jacket.  The police soon arrived and arrested defendant, Newson and McKenzie's mother, who had a warrant for selling drugs.

After the arrest, defendant telephoned McKenzie and asked her why she had told police that he had been with Newson.  He told her to tell police that she had been half asleep and did not know what she was talking about.  McKenzie, in turn, refused to lie to the police.  Defendant told McKenzie to tell police that "everybody used the lighter," but she had never seen the "gun" and did not know what he was talking about.  Defendant instructed McKenzie to tell Foster to claim that she had used his sweater and had transferred fibers from her wig.  McKenzie replied, "whatever."  He responded that if she did not want to say this, she should say that defendant and Foster had slept together and the fibers found on him were her real hair.  McKenzie again replied, "[w]hatever," and hung up the phone.

A criminalist determined that the hair fibers found on defendant were not Foster's hair.

### Defense's Case

Newson testifed.  He claimed that on the morning of the robbery he drove himself to his sister's apartment, discovered she was not home, and got lost while en route back to the Erickson Street house.  Newson then gave defendant a ride to the gas station located two blocks away.  Newson denied associating with anyone as old as defendant and denied owning the sweatpants found in the trash can.

Donald Hamilton had been defendant's friend for 20 years.  On a morning in May, Hamilton met defendant at a gas station and waited with him for about 15 to 20 minutes drinking beer.  A blue car, apparently driven by defendant's sister, arrived and defendant walked away presumably to the car.

Defendant's sister, Deborah Perry, confirmed that "sometime" in May she asked defendant to do errands including picking up her child and paying her cable television bill.  Perry testified she gave defendant $135 to pay the cable bill for five rooms in her house.

A psychologist testified to the factors affecting a witness's identification of a suspect, including lighting, distractions, stress,

6

race, and the use of a photo lineup.

A detective testified that doughnut shop patron Sutton was shown a photo lineup containing defendant and Newson; Sutton did not identify either man. Sergeant Bozworth did not identify defendant at the show up near the Erickson Street house.

Neither defendant's nor Newson's fingerprints were found on the sack containing the hat, wig, and gun. None of defendant's clothing was found at the Erickson Street house. Bozworth believed that both suspects wore sweatpants, but only one pair of sweatpants was found. Defendant was not wearing sweatpants when arrested. A detective opined that authorities did not have enough time to search the entire house.

Officer Pane confirmed that when he observed defendant on Erickson Street, defendant walked at a regular pace and did not try to avoid Pane. Pane stopped defendant because he walked past the suspect Oldsmobile. At the time of the stop, defendant was not dressed like one of the robbers.

Sacramento County Sheriff's Deputy Cathryn Hill interviewed Egenhoff about the gun used in the robbery. The gun recovered by deputies did not match the description Egenhoff gave Hill.

Deborah Perry's coworker at an elementary school testified that Perry is an honest person.

(Lodged Doc. 3 at 2-11.) Defendant was convicted by a jury of second degree robbery (CAL. PENAL §§ 211; 212.5(c)) with a penalty enhancement for personal use of a firearm (CAL. PENAL § 12202.5). The jury deadlocked, resulting in a mistrial, on two additional counts of second degree robbery (CAL. PENAL § 211) and one count of false imprisonment (CAL. PENAL § 236), and the District Attorney elected to dismiss those counts for insufficient evidence. Petitioner also entered a plea of no contest during his trial to one count of inducing another person to give false testimony (CAL. PENAL § 137(c)). The trial court also found true allegations that Petitioner had suffered five serious felony convictions (CAL. PENAL § 667(a)). Petitioner was sentenced, in the aggregate, to a determinate term of sixteen years plus an indeterminate term of twenty-five years to life imprisonment with the possibility of parole.

Following his convictions, but prior to sentencing, Petitioner filed a petition for writ of mandate in the California Court of Appeal, Third Appellate District on March 14, 2001. The

7

petition was denied without comment on March 22, 2001.  He filed another petition for writ of mandate in the same court on March 27, 2001.  That petition was denied without comment on April 12, 2001.  Petitioner then filed yet another petition for writ of mandate in the California Supreme Court on April 5, 2001.  That petition was construed as a petition for review, and was denied without comment on May 16, 2001.  Petitioner filed a final petition for writ of mandate, also construed as a petition for review, in the California Supreme Court on April 18, 2001.  The petition was denied without comment on May 16, 2001.  Petitioner was sentenced on June 15, 2001.

Petitioner timely appealed his convictions to the California Court of Appeal, Third Appellate District.  The appellate court affirmed his convictions in a reasoned opinion on January 9, 2003.  He next sought review of his convictions in the California Supreme Court, which was denied without comment on March 19, 2003.

After exhausting the appellate process, Petitioner sought habeas corpus relief in the Sacramento County Superior Court.  That petition was denied because it duplicated a previously filed motion for new trial, which had been construed as a petition for writ of habeas corpus by the trial court.  He then filed habeas corpus petitions in the California Court of Appeal, Third Appellate District, and the California Supreme Court.  Those petitions were denied without comment on May 14, 2003 and March 3, 2004, respectively.

Petitioner then sought habeas corpus relief for a second time in the Sacramento County Superior Court.  His petition was denied in a reasoned opinion on the merits of his claims on March 15, 2004.  He subsequently filed habeas corpus petitions in the California Court of Appeal, Third Appellate District, and the California Supreme Court, both of which were denied without comment.

Petitioner filed this federal petition for writ of habeas corpus on April 21, 2005.  Respondent filed an answer on January 5, 2006, and Petitioner filed his traverse on February 13, 2006.

**IV.  APPLICABLE STANDARD OF HABEAS CORPUS REVIEW**

1          This case is governed by the provisions of the Antiterrorism and Effective Death

2   Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after

3   its enactment on April 24, 1996. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Jeffries v. Wood*, 114

4   F.3d 1484, 1499 (9th Cir. 1997).  Under AEDPA, an application for a writ of habeas corpus by a

5   person in custody under a judgment of a state court may be granted only for violations of the

6   Constitution, federal laws, or treaties of the United States.  28 U.S.C. § 2254(a); *Estelle v. McGuire*,

7   502 U.S. 62, 67-68 (2001); *Williams v. Taylor*, 529 U.S. 362, 375 n. 7 (2000).  Federal habeas

8   corpus relief is not available for any claim decided on the merits in state court proceedings unless

9   the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

14   28 U.S.C. § 2254(d).  Although "AEDPA does not require a federal habeas court to adopt any one

15   methodology," *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003), there are certain principles which guide

16   its application.

17          First, AEDPA establishes a "highly deferential standard for evaluating state-court

18   rulings." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  Accordingly, when determining whether

19   the law applied to a particular claim by a state court was contrary to or an unreasonable application

20   of "clearly established federal law," a federal court must review the last reasoned state court

21   decision. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004); Avila v. Galaza, 297 F.3d 911,

22   918 (9th Cir. 2002).  Provided that the state court adjudicated petitioner's claims on the merits, its

23   decision is entitled to deference, no matter how brief. *Lockyer*, 538 U.S. at 76; *Downs v. Hoyt*, 232

24   F.3d 1031, 1035 (9th Cir. 2000).  Conversely, when it is clear that a state court has not reached the

25   merits of a petitioner's claim, or has denied the claim on procedural grounds, AEDPA's deferential

26   standard does not apply and a federal court must review the claim de novo. *Nulph v. Cook*, 333 F.3d

9

1  1052, 1056 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

2          Second, "AEDPA's, 'clearly established Federal law' requirement limits the area of

3  law on which a habeas court may rely to those constitutional principles enunciated in U.S. Supreme

4  Court decisions." *Robinson*, 360 F.3d at 155-56 (citing *Williams*, 529 U.S. at 381).  In other words,

5  "clearly established Federal law" will be " the governing legal principle or principles set forth by

6  [the U.S. Supreme] Court at the time a state court renders its decision." *Lockyer*, 538 U.S. at 64.

7  It is appropriate, however, to examine lower court decisions when determining what law has been

8  "clearly established" by the Supreme Court and the reasonableness of a particular application of that

9  law.  *See Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000).

10          Third, the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have

11  "independent meanings." *Bell v. Cone*, 535 U.S. 685, 694 (2002).  Under the "contrary to" clause,

12  a federal court may grant a writ of habeas corpus only if the state court arrives at a conclusion

13  opposite to that reached by the Supreme Court on a question of law, or if the state court decides the

14  case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*,

15  529 U.S. at 405.  It is not necessary for the state court to cite or even to be aware of the controlling

16  federal authorities "so long as neither the reasoning nor the result of the state-court decision

17  contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).  Moreover, a state court opinion need not

18  contain "a formulary statement" of federal law, but the fair import of its conclusion must be

19  consistent with federal law.  *Id*.

20          Under the "unreasonable application" clause, the court may grant relief "if the state

21  court correctly identifies the governing legal principle...but unreasonably applies it to the facts of

22  the particular case." *Bell*, 535 U.S. at 694.  As the Supreme Court has emphasized, a court may not

23  issue the writ "simply because that court concludes in its independent judgment that the relevant

24  state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*,

25  529 U.S. at 410.  Thus, the focus is on "whether the state court's application of clearly established

26  federal law is *objectively* unreasonable." *Bell*, 535 U.S. at 694 (emphasis added).

Finally, a petitioner bears the burden of demonstrating that the state court's decision was either contrary to or an unreasonable application of federal law. *Woodford*, 537 U.S. at 24 ; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

## V. DISCUSSION

### A.  VOICE LINE-UP

Petitioner claims that his federal right to due process of law was violated when the trial court required him to repeat a phrase allegedly spoken by the robber of the Greyhound bus depot during witness Egenhoff's testimony for the purposes of a voice identification. Petitioner argues that no witness, including Egenhoff, visually identified Petitioner with absolute certainty as the older robber of the bus depot. Petitioner contends that the in-court voice identification procedure was unfair, suggestive, prejudicial and likely to achieve false results because the witness Egenhoff already knew that Petitioner was on trial for committing the robbery.

The California Court of Appeal, Third Appellate District, considered and rejected Petitioner's claim on direct appeal, explaining its reasoning as follows:

*The Voice Sample*

Defendant contends the trial court erred by ordering him to furnish a voice sample during victim Egenhoff's testimony. He claims the procedure was highly suggestive and unfair, and Egenhoff had "every incentive" to conclude defendant's voice was highly similar if not identical. We are not persuaded.

*Background*

On redirect examination of Egenhoff, the prosecutor asked whether the older robber's voice was "always shouting" or whether he talked without shouting. Egenhoff answered that the robber "never talked calmly." The prosecutor asked whether defendant's voice was similar to the robber's, and Egenhoff answered it was "[s]imilar, but I couldn't say for sure."

When the jurors departed for a noon recess, the prosecutor asked the trial court to "have this defendant yell something in front of the witness." Defendant responded, "If you instruct me to do it. But if it's a voice lineup then he should do it properly." The court replied that it was not a voice lineup but and in-courtroom demonstration. "[I]f [the prosecutor] asks you to just say, 'Hey, you' in a loud voice,

11

then I will have you do that."

Following the recess, the trial court stated it would have the defendant "shout, 'hey', and 'hurry', and I'd ask you [Egenhoff] to listen to that." Defendant then stated, "[h]ey, hurry." When Egenhoff said the voice he had heard during the robbery was louder, defendant spontaneously repeated, "[h]ey, hurry." Egenhoff testified that the voice was "[v]ery similar, but I wouldn't say absolutely. I wouldn't say absolutely that's the voice. But very similar speaking that way, rather than the way he's been talking, very calmly through the questions."

*Analysis*

"[F]or a witness identification procedure to violate the due process clauses, the state must, at the threshold, improperly suggest something to the witness - - i.e., it must, wittingly or unwittingly, initiate an unduly suggestive procedure." (*People v. Ochoa* (1998) 19 Cal.4th 353, 413.) The issue is whether "'the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law.'" (*Neil v. Biggers* (1972) 409 U.S. 188, 196 [34 L.Ed.2d 401], quoting *Stovall v. Denno* (1967) 388 U.S. 293, 301-302 [18 L.Ed.2d 1199].)

"A single-voice 'lineup,' like a one-person showup or corporeal lineup, may pose a danger of suggestiveness, but such lineups or showups are not necessarily or inherently unfair. [Citations.] Rather, all the circumstances must be considered." (*People v. Clark* (1992) 3 Cal.4th 41, 136.)

In this case, Egenhoff had a significant opportunity to hear the older robber's voice. He first heard someone yell "hey." The older robber ordered Egenhoff to open the cash drawer and give him all the money, shouting, "Hurry, hurry, hurry, or I'm going to shoot you." The older robber asked if there was another register, ordered Egenhoff to open it up, demanded to know the location of the safe, and told Egenhoff to lie down. Defendant does not claim Egenhoff's opportunity to hear the older robber's voice was insufficient and nothing in the record suggests so.

Defendant claims he was ordered to give the voice sample "with no advance warning." The claim ignores the record, which shows that the prosecutor requested the sample before a noon recess and did not obtain it until after the recess near the end of Egenhoff's testimony.

Defendant argues that Egenhoff "was not told that he need not make an identification." Conversely, however, "'there is nothing in the record to show that the district attorney in any way suggested the response [Egenhoff] should make.'" (*People v. Clark, supra,* 3 Cal.4th at p. 137, quoting *People v. Osuna* (1969) 70 Cal.2d 759,

765.)

Defendant does not claim that requiring him to utter the words spoken by the robber was unduly suggestive nor does he claim that the procedure was unduly prolonged. Under all these circumstances, we conclude defendant's due process rights were not violated. (*People v. Clark*, *supra*, 3 Cal.4th at p. 136.)

Alternatively, any error in admitting the voice sample was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].) Before the voice sample was given, Egenhoff testified that defendant's voice was "Similar, but I couldn't say for sure." Following the sample, Egenhoff stated that defendant's voice was "Very similar, but I wouldn't say absolutely." Any increase in Egenhoff's level of certainty was incremental at most. Given all the other identification evidence (see part II, *post*), no reasonable juror's verdict could have turned on Egenhoff's assertion that defendant's voice was not just similar, but *very* similar.

(Lodged Doc. 8 at 11-14.)

The Due Process Clause of the United States Constitution protects a criminal defendant's right to a fair trial, and thus prohibits the use of identification procedures which are "unnecessarily suggestive and conducive to irreparable mistaken identification." *Stovall v. Denno*, 388 U.S. 293, 302 (1967)**.** A suggestive identification may violate due process if it was unnecessary or "gratuitous" under the circumstances. *Neil v. Biggers*, 409 U.S. 188, 198 (1972). *See also United States v. Love*, 746 F.2d 477, 478 (9th Cir. 1984) (articulating a two-step process in determining the constitutionality of pretrial identification procedures: first, whether the procedures used were impermissibly suggestive and, if so, whether the identification was nonetheless reliable). An identification procedure is suggestive where it "[i]n effect . . . says to the witness 'This is the man.'" *Foster v. California*, 394 U.S. 440, 443 (1969). Not all suggestive identifications must be excluded, however. "Juries are not so susceptible that they cannot measure intelligently the weight of the identification testimony that has some questionable feature." *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977). Thus, each case must be considered on its own facts, and whether due process has been violated depends on "'the totality of the circumstances' surrounding the confrontation." *Simmons v. United States*, 390 U.S. 377, 383 (1968). *See also Stovall*, 388 U.S. at 302.

If an out-of-court identification is inadmissible due to unconstitutionality, an in-court identification is also inadmissible unless the government establishes that it is reliable by introducing "clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the [out-of-court] identification." *United States v. Wade*, 388 U.S. 218, 240 (1967). Here, however, although several witnesses gave trial testimony based on their opportunities to identify Petitioner following his arrest and prior to trial, Petitioner does not challenge the pre-trial identification procedure utilized as unnecessarily suggestive. To the contrary, Petitioner's challenge is solely to an in-court verbal identification procedure in which he was ordered by the court, in the presence of and without explanation to the jury, to repeat a phrase that witness Egenhoff had already testified was spoken by the robber during commission of the crime. Petitioner claims that the procedure utilized was suggestive and prejudicial because Egenhoff was already aware that Petitioner was on trial for the robbery. As the state court noted, however, even if the procedure was suggestive or prejudicial, Egenhoff's testimony remained relatively consistent. Prior to the procedure, Egenhoff testified that the robber's voice and Petitioner's voice sounded similar; after the robbery Egenhoff testified that the two voices sounded "very similar," but he could not say with absolute certainty that Petitioner's voice and the robber's voice were from the same person. Thus, it is unlikely that the identification procedure caused Petitioner to be irreparably and mistakenly identified as the robber. However, the due process inquiry does not end there.

"[C]ertain courtroom practices are so inherently prejudicial that they deprive the defendant of a fair trial." *Carey v. Musladin*, 549 U.S. 70, 72 (2006) (citing *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986)*; Estelle v. Williams*, 425 U.S. 501, 503-506 (1976)). *See also United States v. Olvera*, 30 F.3d 1195, 1196 (9th Cir. 1994) "(Some courtroom practices are so inimical to the presumption of innocence that they violate defendants' due process rights"). For example, "the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes . . . ." *Id.* at 75 (internal quotations omitted). *See also Estelle v. Williams*, 425 U.S. at 512. This is because prison clothing acts as a "constant reminder

of the defendant's incarcerated status [and] may affect jurors' perception of him or her as a wrongdoer." *Olvera*, 30 F.3d at 1196 (internal citations omitted). For the same reason, unnecessarily binding or gagging a defendant is also improper absent extenuating circumstances. *Illinois v. Allen*, 397 U.S. 337, 344 (1970) ("Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold."). The presumption of innocence may also be undermined by presence of excessive numbers of security personnel in a courtroom. *Holbrook*, 475 U.S. 560, 570-71 (1986) (finding that deployment of additional courtroom security personnel during trial of respondent and his five co-defendants was not inherently prejudicial, but recognizing "the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial"). Thus, the question in Petitioner's case is whether requiring him to repeat phrases allegedly spoken by the robber during the commission of the crime, in the presence of but without explanation to the jury, for in-court identification purposes, constituted a violation of Petitioner's constitutional right to a fair trial.

"Although not specifically articulated in the constitution, the presumption of innocence is an integral part of the right to a fair trial." *Norris v. Risley*, 918 U.S. 828 at 831 (citing *Estelle v. Williams*, 425 U.S. at 503.). The Ninth Circuit, under circumstances similar to the case at hand, has held that compelling a defendant to speak a phrase alleged to have been spoken by a bank robber, in the presence of the jury, "posed an unacceptably high risk of influencing the jury's judgment in a manner that undermined the presumption of innocence" such that the defendant did not receive a fair trial. *Olvera*, 30 F.3d at 1198-99. The Court reached this conclusion in spite of the fact that the trial court had given an instruction informing the jury that the defendant "was not testifying when he spoke the words but was simply demonstrating the sound of his voice." *Id*. In that case, the defendant was convicted at trial of unarmed bank robbery after he was compelled, during the testimony of one of the robbery victims, to stand in front of the jury and repeat a phrase

the witness alleged was spoken by the robber.  Recognizing that "a defendant's utterance of a criminal statement may not have an undue influence on the jury where the jury has a clear understanding that the utterance is necessary for the identification of the defendant by a witness," the Court nonetheless reversed the conviction for several reasons.  *Id*. at 1197.  First, the witness identified the defendant visually at trial and never testified that she could identify him only by his voice.  *Id*. at 1198.  Moreover, "[t]he jury was presented with no explanation why it was essential to require [the defendant] to repeat the bank robber's words.  Without such an understanding, the jury was more likely to infer from [his] utterance of these words a connection between him and the charged conduct."  *Id*. at 1198.  Next, the in-court voice identification procedure was not carried out "in a manner calculated to minimize potential negative inferences."  *Id*.  Finally, the defendant had invoked his Fifth Amendment right and did not testify at trial.  Therefore, "[h]is utterance of the robbery's words . . . was likely to stand out in the jury's memory and to affect its ultimate assessment of his culpability."  *Id*.  Petitioner's case presents a similarly troubling fact pattern, particularly in light of his pro se status at trial.

Here, although witness Egenhoff testified regarding statements he recalled the robber making during the commission of the crime, he never testified that he could identify the robber only by his voice, that he could identify the robber's voice generally, or that he could better identify Petitioner as the robber by voice if he heard him shout rather than speaking calmly. *Compare with United States v Domina*, 784 F.2d 1361, 1371 (1986) (witness testified that she could identify perpetrator of crime by his voice and that she knew of no other way to identify him).  To the contrary, on redirect examination, the prosecutor reminded the witness that he had heard Petitioner's speaking voice because he had been questioned by Petitioner, acting as his own counsel, on cross examination.  The prosecutor then inquired whether, during the robbery, Egenhoff had an opportunity to hear the robber speak without shouting.  In response, Egenhoff stated that he only heard the robber shout and that he had not had an opportunity to hear him speak calmly.  The prosecutor then asked Egenhoff to compare Petitioner's speaking voice to Egenhoff's memory of

16

the robber's voice.  Egenhoff opined that the two voices sounded similar, but based on his recollection, he could not be absolutely certain that the two voices were the same.

On re-redirect examination, and without explanation to the jury as to why it was necessary for Petitioner to repeat the robber's alleged words, the prosecutor questioned Egenhoff as follows:

> [Q].    Earlier - - You were talking about that Mr. Logan's voice seemed similar, but the robber's voice, when you heard the robber's voice the voice was yelling; isn't that right?
>
> A.    Most of the time very loud, shouting, talking fast.
>
> Q.    Okay.  And you said that you had heard someone - - Well, that robber say, "hey," and he said "hurry". Amongst other things, right?
>
> A.    That's correct.
>
> Q.    Okay.  The Court's going to have Mr. Logan shout "hey," and "hurry", and I'd ask you to listen to that. And if you want to hear it again in case you don't get it, if that two words isn't enough, you know, it will be repeated.  And I just wanted to let you know what was going on.
>
> THE COURT:    All right.  Mr. Logan, if you would please.
>
> [MR. LOGAN]:    "Hey, hurry."
>
> Q.    [ ] Was that as loud as you heard?
>
> A.    No, it wasn't.
>
> Q.    Was it louder?
>
> A.    It was louder than that.
>
> Q.    Okay.
>
> [MR. LOGAN]:    "Hey, hurry."
>
> THE WITNESS:    A little bit louder, but closer to that.
>
> THE COURT:    All right, that's enough counsel.
>
> [MR. LOGAN]:    All right.

MR. CHOE:          Okay.

Q.     And having heard Mr. Logan's voice, a little bit louder, what is your mental impression, if any?

A.     Very similar, but I wouldn't say absolutely.  I wouldn't say absolutely that's the voice.  But very similar speaking that way, rather than the way he's been talking very calmly through the questions.

Q.     Okay.  And did the robber yell louder than what you heard today or about the same?  In terms of volume?

A.     A little bit louder.

MR. CHOE:          Okay.  Nothing further.

(Lodged Doc. 2 at 521-522).

Finally, Petitioner invoked his Fifth Amendment right not to testify at trial.  Thus, requiring him to repeat the robber's words in front of the jury had the potential to "stand out in the jury's memory and to affect its ultimate assessment of [Petitioner's] culpability.  *Olvera*, 30 F.3d at 1198.  Of course, unlike a criminal defendant represented by counsel who elects to invoke his right not to testify, because Petitioner represented himself at trial this was not the only time the jury heard him speak, potentially mitigating the prejudicial impact of the in-court voice identification procedure.

The voice identification procedure conducted at Petitioner's trial is a concern.  Even if the procedure rose to the level of a due process violation, however, relief is only warranted if the error was not harmless.  *Ghent v. Woodford*, 279 F.3d 1121, 1126 (9th Cir. 2002).  The question on habeas corpus review is whether Petitioner was prejudiced by the alleged error.  In other words, the court must determine whether the verbal demonstration had "a substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *Fry v. Pliler*, 551 U.S. 112, 121-122 (2007) ("We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard . . . .").

Here, as the state court properly noted, the in-court voice identification procedure had little, if any effect on Egenhoff's testimony.  Prior to the demonstration, Egenhoff testified that Petitioner's voice was "similar" to that of the robber, but he could not say absolutely whether the two voices were identical.  Following the demonstration, Egenhoff's testimony was that the voices were "very similar," however he still could not state with absolute certainty whether he was able to identify Petitioner as the robber by the sound of his voice.

Moreover, substantial evidence aside from the verbal demonstration was admitted at trial identifying Petitioner as the older of the two robbers of the bus depot.  LaQuanda McKenzie testified that she saw Petitioner and his co-defendant, Newson, leave the Erickson Street house together early in the morning on the date the robbery was committed.  McKenzie heard the two doors of Newson's car close and the car drive away.  Officer Bozworth testified that he witnessed two men get out of a car near the bus depot.  The men left their car in a suspicious manner and later ran back to their car and sped away.  Bozworth followed the car and obtained the vehicle's license plate number.  The car was registered to Newson.  Petitioner and Newson were both arrested in close proximity to the Erickson Street house, the address listed on Newson's car registration, and both men had large amounts of cash on them.  Egenhoff described the older robber as having dreadlocks and wearing a knit beanie or cap.  He also described a small gun that was used in the robbery.  Egenhoff visually identified Petitioner as being the older of the two robbers, albeit not with absolute certainty.  In a field next to the Erickson Street house, police officers discovered a sack containing a cap, a wig, and a gun-shaped lighter.  Hairs from the wig were found inside the cap.  Hairs were also found on Petitioner's head, and testing of the hairs on Petitioner's head and hairs from the wig indicated that they could be from the same source.  In addition, McKenzie identified the knit cap as belonging to Petitioner.  Under these circumstances, it cannot be concluded that the in-court voice identification procedure had a substantial and injurious effect on the jury's verdict.

Petitioner is not entitled to federal habeas corpus relief for this claim.

**B.     TRIAL MOTION FOR JUDGMENT OF ACQUITTAL BASED ON INSUFFICIENT**

**EVIDENCE TO SUPPORT A JURY FINDING OF GUILT**

Petitioner claims that the trial court  improperly denied his motion for judgment of acquittal, in violation of his right to due process, because there was insufficient credible evidence presented against him at trial to sustain a jury finding that he was guilty of the robbery beyond a reasonable doubt.  A criminal defendant may move for a judgment of acquittal under section 1118.1 of the California Penal Code "at the close of evidence on either side and before the case is submitted to jury for decision . . . if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."  Petitioner's contention that he should have been granted relief under state law presents no federal habeas corpus issue.  The California courts' interpretation and application of section 1118.1 of the California Penal Code is not subject to review by this court. The trial court's denial of Petitioner's motion to acquit can be challenged only to the extent that he alleges there was insufficient evidence to convict him of the robbery charge.

The California Court of Appeal, Third Appellate District, considered and rejected Petitioner's claim on direct appeal, explaining its reasoning as follows:

*Sufficiency of the Evidence*

Defendant contends his conviction is not supported by sufficient evidence because the prosecution's evidence "consisted of insubstantial eyewitness and circumstantial evidence."  He argues Sergeant Bozworth was unable to identify defendant; there were inconsistencies between Bozworth's description of the suspects and the description originally broadcast; Egenhoff was unable to identify defendant; Egenhoff's description of the dreadlock protruding from the cap did not match the wig; items found in the sack were not positively linked to defendant' Egenhoff's description of the gun did not match the one found; McKenzie had never seen defendant with the wig; and the criminalist "could not state absolutely " that the fibers taken from defendant came from the wig.

"'To determine sufficiency of the evidence, we must inquire whether a rational trier of fact could find defendant guilty beyond a reasonable doubt.  In this process we must view the evidence in the light most favorable to the judgment and presume in favor of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence.  To be sufficient, evidence of each of the essential elements of the crime must be substantial and we must resolve the question of sufficiency in light of the record as a whole.'"

(*People v. Carpenter* (1997) 15 Cal.4th 312, 387, quoting *People v. Johnson* (1993) 6 Cal.4th 1, 38; see *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560].)

"'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.'" (*People v. Perez* (1992) 2 Cal.4th 1117, 1124, quoting *People v. Bean*, (1988) 46 Cal.3d 919, 932-933; *People v. Ceja* (1993) 4 Cal.4th 1134, 1139.)

There was sufficient evidence identifying defendant as the older of the two perpetrators of the Greyhound Bus Depot robbery. Early on the morning of May 11, 2000, McKenzie saw defendant and Newson leave together. She heard Newson's two car doors close and the car drive away. Shortly thereafter, Bozworth saw two men get out of a car. The men appeared nervous, looked around and acted suspiciously as if they were about to commit a robbery. After the men ran back to their car and sped away, Bozworth followed them and obtained the license plate number. The car was registered to Newson. Deputies soon arrested defendant and Newson. Both men had significant amounts of money on them in various denominations. After examining defendant close up, Egenhoff determined that he was about 89 percent sure defendant was the older assailant. Defendant's voice was very similar to that of the older robber. Police recovered a sack in a field behind the Erickson street house. The sack appeared "fairly new" and looked "out of place" among some weeds. It contained a cap, a wig, and a gun-shaped cigarette lighter. The wig was shedding and it had shed inside the cap. McKenzie identified the cap as belonging to defendant. Authorities noticed that defendant had fibers on his person. A criminalist confirmed that fibers found on defendant were similar in appearance to the wig. Defendant made postarrest admissions and statements to McKenzie that strongly indicated his consciousness of his guilt.

Defendant's arguments suggest the circumstantial evidence can be reconciled with a finding of his innocence. Even if that is so, however, that alone does not warrant reversal of the judgment. (*People v. Perez*, *supra*, 2 Cal.4th at p. 1126.)

Defendant also argues that "[o]nly a minimal foundation was laid" by the criminalist for admission of the hair evidence and that the criminalist's method was unreliable. However, defendant did not object at trial to the alleged absence of foundation or to the scientific acceptance of the criminalist's technique. Defendant has waived any objection on this basis. (Evid. Code, § 353; *People v. Hold* (1997) 15 Cal.4th 619, 666-667.)

21

(Lodged Doc. 8 at 14-17.)

   The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H.V. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). The United States Supreme Court has established a two-step inquiry for considering a challenge to a conviction based on the sufficiency of the evidence. *Jackson v. Virginia*, 443 U.S. 307 (1979). *See also U.S. v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010). First, the court considers the evidence at trial in the light most favorable to the prosecution. *Jackson*, 443 U.S. at 319. The prosecution is not required to "rule out every hypothesis except that of guilt," and the reviewing court, "when faced with a record of historical facts that supports conflicting inferences, must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Wright v. West*, 505 U.S. 277, 296-97 (1992) (internal citations omitted). *See also Nevils*, 598 F.3d at 1164. Indeed, it is the province of the jury to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. *See also Schlup v. Delo*, 513 U.S. 298, 330 (1995) ("[U]nder *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review."); *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004) ("A jury's credibility determinations are therefore entitled to near-total deference under *Jackson*."). Thus, a reviewing court "may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial." *Nevils*, 598 U.S. at 1164 (citing *Jackson*, 443 U.S. at 318-319).

   Second, after viewing the evidence in the light most favorable to the prosecution, the reviewing court must determine "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 318. "At this second step, however, a

reviewing court may not ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt, only whether *any* rational trier of fact could have made that finding." *Nevils*, 598 F.3d at 1164 (internal quotations omitted) (emphasis in original).  The second step requires reversal of the verdict "if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt." *Id*.

In this case, Petitioner argues that even viewing the evidence in the light most favorable to the prosecution, there is insufficient evidence in the record to prove beyond a reasonable doubt that he was, in fact, one of the two perpetrators of the robbery.  According to Petitioner, no witness identified him with complete certainty before or at trial as being one of the two robbers, and only circumstantial evidence linked him to the crime.  In addition, Petitioner points to various testimony and evidence presented at trial which he argues conflicts with any identification of him as the robber.

Viewing the evidence in the light most favorable to the prosecution, and for the reasons described by the California Court of Appeal, it is apparent that there was sufficient evidence from which a rational trier of fact could have found beyond a reasonable doubt that Petitioner was guilty of the robbery charge.  Indeed, circumstantial evidence alone is sufficient to support a conviction.  *See Jackson v. Virginia*, 443 U.S. 307, 324-25 (1979) ("From the circumstantial evidence in the record, it is clear that the trial judge could reasonably have found beyond a reasonable doubt that the petitioner did possess the necessary intent at or before the time of the killing."); *Schad v. Ryan*, 606 F.3d 1022, 1038 (9th Cir. 2010) ("Circumstantial evidence and reasonable inferences drawn from it may properly form the basis of a conviction.").  Moreover, this court must defer to the presumption that the jury resolved any conflicting evidence in the record in favor of the prosecution.  *Wright*, 505 U.S. at 296-97.  That Petitioner can construct from the evidence alternative scenarios at odds with the verdict does not mean that the evidence was insufficient to support his conviction.  The state court opinion rejecting Petitioner's argument is a

reasonable construction of the evidence in this case and is not contrary to or an objectively unreasonable application of clearly established federal law. *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002); 28 U.S.C. § 2254(d)(1). Accordingly, Petitioner is not entitled to habeas corpus relief on his claim that the evidence introduced at his trial was insufficient to support his robbery conviction.

## C.   JUROR CONTACT INFORMATION

Petitioner claims that, after a witness informed the defense at trial of certain juror conversations, the trial court improperly denied Petitioner's post-verdict request for juror contact information and an opportunity to poll the individual jurors regarding what each one may have overheard. Petitioner alleges that he was denied both the juror information he sought as well as the funds necessary for an investigator to have performed further investigation on this matter. Petitioner claims that he was informed by the trial court that he could request both juror information and additional funding by way of a motion, however several subsequently filed motions on the matter were denied by the trial court. Petitioner does not specify what information he believes he would have discovered had further investigation been permitted or juror information disclosed by the trial court, nor does Petitioner allege what effect, if any, further investigation or juror information would have had on the outcome of his trial.

The California Court of Appeal, Third Appellate District, considered and rejected Petitioner's claim on direct appeal, explaining its reasoning as follows:

> *Request for Juror Information*
>
> Defendant contends the trial court erred by denying his requests for juror information pursuant to Code of Civil Procedure section 237 to investigate alleged juror misconduct
>
> *Background*
>
> The jury returned its verdict on the robbery count on February 16, 2001. On March 6, 2001, defendant filed an "Ex Parte Motion [for] Permission to Poll Jurors." In the motion, defendant explained that "a person" notified the defense that some law enforcement personnel were engaged in conversations among themselves that were

prejudicial to defendant and Newson within earshot of the jurors.

In support of the motion, defendant submitted his own declaration that "it was conveyed to me that conversations were overheard while jurors were also outside," that the "purpose of this request is to ascertain if in fact improperly received information was utilized in the deliberation process," and that he has "no other method of acquiring this information."

On March 9, 2001, the trial court issued a minute order stating, "After having read and considered the motion, the Court hereby denies the motion as Defendant failed to show good cause."

On April 2, 2001, defendant again filed an ex parte motion for release of juror personal information.  He complained he had been denied funding to investigate, and again stated that "[s]tatements were repeatedly overheard in the halls early in the trial, and only through polling the 12 jurors . . . can I truly assess what happened."

In support of that motion, defendant submitted his own declaration that he had "been informed of improper comments uttered within earshot of the Jury [in] this matter," and that he sought release of the information for the purpose of his investigator "polling [the] jury, and investigating these claims of impropriety."

On April 5, 2001, the trial court issued a minute order stating in relevant part: "Defendant's present motion is for release of juror personal information previously sealed by the Court. . . .  Code of Civil Procedure Section 237 subdivision (b) provides for a hearing on such a petition only upon a showing under oath for good cause. [ ¶ ] Defendant's declaration fails to set forth facts in sufficient detail to warrant a finding of good cause.  Accordingly, defendant's motion for release of juror personal information is hereby denied."

On May 1, 2001, defendant filed another motion for the sealed jury information or for an Evidence Code section 402 hearing to examine each of the jurors.  Defendant also complained that his investigator was not given funds to speak to jurors.  Defendant attached as an exhibit to the motion a letter from his girlfriend, Foster, stating that when she brought clothes for her son, Newson, she heard police talking to a victim of one of the other counts.  Foster wrote that, in the presence of people wearing jury badges, police asked the victim, "weren't you scared when Newson was holding the gun on you?" Police then "went on talking about how easy robbers can pull the trigger."

In support of the motion, defendant submitted his own declaration that he received Foster's letter on April 29, 2001 and needed the information to question the jurors.

On May 14, 2001, the trial court denied defendant's motion because

it needed to be supported by Foster's letter under penalty of perjury rather than a "hearsay letter addressed to" defendant.  The court also noted that the location where Foster would have brought clothing to Newsom would not have been anywhere near where the jury was located.  After defendant orally addressed a related concern, the court ruled that the motion was "still inadequate" and told defendant that he "may file it in an adequate manner and [the] Court will consider it."  Defendant did not file any further motion on the matter.

*Analysis*

A trial court's ruling on a petition for disclosure of juror information is reviewed for abuse of discretion.  (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1096.)  Where "a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

Code of Civil Procedure section 237, subdivision (a)(2), provides: "Upon the recording of a jury's verdict in a criminal jury proceeding, the court's record of personal juror identifying information of trial jurors, as defined in Section 194, consisting of names, addresses, and telephone numbers, shall be sealed until further order of the court as provided by this section."  Subdivision (b), in turn, provides in relevant part: "Any person may petition the court for access to these records.  The petition shall be supported by *a declaration that includes facts sufficient to establish* good cause for the release of the juror's personal identifying information."  (Italics added.)

"'It is settled . . . that "a jury verdict may not be impeached by hearsay affidavits."' [Citation.]" (*Burns v. 20th Century Ins. Co.* (1992) 9 Cal.App.4th 1666, 1670-1671, quoting *People v. Williams* (1988) 45 Cal.3d 1268, 1318.)  Because the only purpose for the release of juror information was to impeach the verdict, defendant's hearsay affidavits were not sufficient to establish good cause for the release.

The first two motions were supported by defendant's declarations, which related conversations conveyed to him by others.  Defendant declared, "it was conveyed to" him, and he has "been informed," that improper conversation occurred in the presence of the jurors.  However, the person or persons who conveyed the information to defendant were not identified.  Thus, the assertions of misconduct are hearsay.  (Evid. Code, § 1200, subd. (a); see *People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322.)

The third motion was supported by defendant's declaration that he received the attached letter from Foster.  However, there was no declaration by Foster.  This was fatal to defendant's motion,

regardless of whether the trial court was correct in its belief that Foster did not bring clothing anywhere near the jurors. The trial court gave defendant an opportunity to submit a "declaration that includes facts sufficient to establish good cause" for his request, but he failed to do so. (Code Civ. Proc., § 237, subd. (B).) Under these circumstances, the trial court correctly found that defendant failed to establish good cause for release of juror identifying information.

(Lodged Doc. 8 at 17-22.)

Section 237(a)(2) of the California Code of Civil Procedure provides that "[u]pon the recording of the jury's verdict in a criminal jury proceeding, the court's record of personal juror identifying information . . . consisting of names, addresses, and telephone numbers, shall be sealed until further order of the court as provided by this section." A party seeking to unseal juror personal information must establish "a prima facie showing of good cause for the release." CAL. CODE CIV. PROC. § 237(b). Good cause in this context means "a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for a new trial." *People v. Rhodes*, 212 Cal.App.3d 541, 552 (1989). Although *Rhodes* was decided before the present enactment of section 237, its test "survived the amendment." *People v. Carrasco*, 163 Cal.App.4th 978, 990 (2008). Importantly, the trial court's ruling on a section 237(b) request is subject to review only for an abuse of discretion. *Id.*

To the extent that Petitioner's juror information claim is grounded in state law, it is not cognizable on federal habeas corpus review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[It] is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Hubbart v. Knapp*, 379 F.3d 773, 779-80 (9th Cir. 2004). "[T]he availability of a claim under state law does not of itself establish that a claim was available under the United States Constitution." *Duggar v. Adams*, 489 U.S. 401, 409 (1989).

To the extent that Petitioner alleges a violation of federal law, he does not identify clearly established United States Supreme Court authority in support of the proposition that he has a federal constitutional right to obtain juror personal identifying information or to perform a post-

verdict poll of the jury.   Indeed, a thorough search reveals no such Supreme Court precedent in support of Petitioner's claim.   "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law."   *See*, *e.g.*,*Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004).

In any event, good cause to unseal juror information did not exist.   As the state appellate court found, although given several opportunities, Petitioner failed to make a sufficient showing to support a reasonable belief that juror misconduct occurred or to demonstrate that further investigation into his allegations was necessary.   Moreover, the state appellate court expressly determined that, as a matter of state law, the trial court properly denied Petitioner's request for juror personal identifying information.   The state court's interpretation and application of state law is binding on this court.   *Bradshaw v. Richey*, 546 U.S.74, 76 (2005) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).   Petitioner is not entitled to federal habeas corpus relief on this claim.

## D.   FALSE EVIDENCE

Petitioner claims that false evidence was material in securing his conviction, violating his right to equal protection under the law.   According to Petitioner, witness LaQuanda McKenzie falsely identified a blue cap as belonging to Petitioner, and this evidence constituted much of the circumstantial evidence utilized by the trial court to tie Petitioner to the crime and to justify denial of his Motion for a Judgment of Acquittal.[1]

---

[1] Before proceeding with a federal habeas corpus petition, a state prisoner must first exhaust state court remedies.   28 U.S.C. § 2254(b); *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981); *Larche v. Simons*, 53 F.3d 1068, 1071 (9th Cir. 1995).   Exhaustion requires that the federal claim be fairly presented to the state's highest court to which appeal is available.   *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-47 (1999).

Here, Petitioner's claim was denied on collateral review by the California Supreme Court without comment but with pinpoint citation to two California Supreme Court cases, *People v. Duvall*, 9 Cal.4th 464, 474 (1995) and *In re Swain*, 34 Cal.2d 300, 304 (1949).   These citations indicate that the court denied the claim because it was not alleged with sufficient particularity, making it procedurally deficient.   *Kim v. Villalobos*, 799 F.2d 1317, 1319 (9th Cir. 1986).

The knowing use of perjured testimony against a defendant to obtain a conviction violates a criminal defendant's federal right to due process of law. *Napue v. Illinois*, 360 U.S. 264 (1959). *See also Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) ("One of the bedrock principles of our democracy, implicit in any concept of ordered liberty, is that the State may not use false evidence to obtain a criminal conviction." (internal citations omitted)).  Establishing a claim for relief based on the prosecution's introduction of perjured testimony at trial is two pronged.  First, the petitioner must demonstrate that the testimony was false.  *United States v. Polizzi*, 801 F.2d 1543, 1549-50 (9th Cir. 1986).  Second, the petitioner must establish that the prosecution knowingly used the perjured testimony.  *Morales v. Woodford*, 388 F.3d 1159, 1179 (9th Cir. 2004).  Mere speculation regarding these factors is insufficient to meet the petitioner's burden.  *United States v. Aichele*, 941 F.2d 761, 766 (9th Cir. 1991).  In addition, the false testimony must have been material. *United States v. Zuno-Arce*,l 339 F.3d 886, 889 (9th Cir. 2003).  Under *Napue*, false testimony is material, and therefore prejudicial, if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *Hayes*, 399 F.3d at 984 (internal citation omitted).

In this case, Petitioner has failed to demonstrate that McKenzie's testimony was, in fact, false.  In support of his claim, Petitioner supplies the notarized statement of Debra Foster, dated almost two full years after the conclusion of Petitioner's trial.  Foster claims that she has moved several times since Petitioner's arrest and that during one of these moves, she discovered a blue knit cap.  According to Foster, upon discovery of the cap, her daughter told her that the cap belonged to Petitioner and that "the people took [hers] when they took [Petitioner] and [his co-defendant]."  (Pet.

---

Respondent claims that the California Supreme Court's denial of this claim with citations to *Duvall* and *Swain* demonstrates that the exhaustion requirement was not satisfied.  Claims denied as procedurally deficient are not per se exhausted.  *See Harris v. Superior Court of Cal., Los Angeles County*, 500 F.2d 1124 (9th Cir. 1974); *Kim*, 799 F.2d at 1319-20.  Nevertheless, it will be recommended that habeas corpus relief be denied on the merits because it is clear that Petitioner's claim is not colorable.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."; *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) (a federal court considering a habeas corpus petition may deny an unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable").

at 28).  The statement of Foster's daughter is hearsay because it is offered to show the truth of the matter stated, that the cap taken into evidence by the state did not belong to Petitioner but, in fact, belonged to Foster's daughter.  *See* FED. R. EVID. 801.  As the United States Supreme Court has observed, affidavits signed long after trial or based on hearsay are particularly suspect because they are not subject to cross-examination or credibility determinations.  *Herrera v. Collins*, 506 U.S. 390, 417 (1993).  Nor does the affidavit establish with certainty that the cap discovered by Foster during one of her actually belonged to Petitioner.  To the contrary, Foster's affidavit merely states that she knew Petitioner "had this cap, *or a similar one* when he spent the night . . . before he and [his co-defendant] were arrested at [Foster's] home."  (Pet. at 28 (emphasis added)).

Moreover, review of the record demonstrates, at most, possible inconsistencies in McKenzie's testimony.  Inconsistencies in testimony do not equal untruthfulness or establish that a prosecutor knowingly presented false testimony.[2]  *See Price v. Johnston*, 334 U.S. 266, 287 (1948)

---

[2] For example, on direct examination McKenzie testified that, on the morning of the robbery, Petitioner was wearing either a black, dark navy blue or baby blue beanie with a white Nike logo. McKenzie later identified the People's Exhibit No. 46 as the light blue beanie worn by Petitioner on the morning of the robbery.  However, during cross-examination McKenzie testified regarding the beanie as follows:

> Q.    And you say the blue beanie, you said that's my cap; is that correct?
>
> A.    Yes.
>
> Q.    Okay.  Does it have my initials on it or something?
>
> A.    I don't know.
>
> Q.    No.  I'm asking you.  That's just a standard blue [beanie] with a Nike [logo] on it; is that correct?
>
> A.    No.
>
> Q.    You never [sic] seen that before?
>
> A.    Have I ever seen that?
>
> Q.    Have you seen one?
>
> A.    Not that color.

30

("[I]t may well be that the witness' subsequent [inconsistent] statements were true . . ."); *Allen v. Woodford*, 395 F.3d 979, 995 (9th Cir. 2005) ("[E]ven assuming" a witness' trial testimony was false, the conclusion "that the State knew or should have known that it was false" does not automatically follow.") (citing *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002) ("It is a prosecutor's duty to refrain from knowingly presenting perjured testimony . . . .") (internal quotations marks omitted)). In addition, McKenzie was subject to cross-examination by Petitioner at trial. The crux of Petitioner's argument here is that McKenzie's testimony should not have been believed. However, a "reviewing court must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming the jury resolved all conflicts in a manner that supports the verdict. *Walters v. Maas*, 45 F.3d 1355, 1358 (9th Cir. 1995). *See also Schlup v. Delo*, 513 U.S. 298, 330 (1995) ("[T]he assessment of the credibility of witnesses is generally beyond the scope of [federal habeas corpus] review.").

Even assuming arguendo that Petitioner's contention that McKenzie testified falsely is meritorious, Petitioner has not alleged that the prosecution had any reason to know that the testimony was false or knowingly presented the perjured testimony at his trial. Rather, Petitioner claims that under section 1473(c) of the California Penal Code, he is not required to demonstrate that the prosecution knowingly presented perjured testimony in order to obtain habeas corpus relief on false testimony grounds. *See*, *e.g.*, *In re Bell*, 42 Cal.4th 630, 786 (2007) ("The petitioner's claim of false testimony requires proof that false evidence was introduced against petitioner at his trial and that such evidence was material or probative on the issue of guilt.") (internal citations omitted). However, relief may not be granted on federal habeas corpus review for an alleged error in state law. *See Smith v. Phillips*, 455 U.S. 209, 221 (1982) ("A federally issued writ of habeas corpus, of course, reaches only convictions obtained in violation of the United States Constitution."). A writ of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis of some transgression of federal law binding on the state courts. *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1986);

*Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983). As discussed above, under clearly established federal law, an allegation only that false evidence or perjured testimony was introduced is not a due process violation absent knowing use by the prosecution. *Carothers v. Rhey*, 594 F.2d 225, 229 (9th Cir. 1979).

Finally, to the extent that Petitioner claims that his federal right to equal protection of the law were violated by the alleged false testimony of McKenzie, this claim lacks legal or factual support because there is no allegation or indication that Petitioner was treated differently from other similarly situated individuals. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) ("The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." (internal quotations omitted)). Nor does Petitioner claim that he was discriminated against as a result of his membership in a suspect class, such as race. *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005). Petitioner's conclusory allegation that his right to equal protection of the law was violated, "[un]supported by a statement of specific facts [does] not warrant habeas corpus relief." *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).

For the reasons stated above, Petitioner is not entitled to federal habeas corpus relief on his false evidence claim.

**E.      IMPEACHMENT EVIDENCE**

Petitioner claims that the prosecution improperly represented that witness, LaQuanda McKenzie, had no criminal record when, in fact, she did have a criminal record and was on probation in Sacramento County at the time of trial. Thus, Petitioner alleges that the prosecution violated his federal rights to confrontation and to due process by failing to disclose evidence favorable to his defense. *See Brady v. Maryland*, 373 U.S. 83 (1963). Moreover, Petitioner claims that the prosecution falsely represented to both the defense and to the jury that McKenzie had no criminal record.

The Sacramento County Superior Court considered and denied Petitioner's claim on collateral review, explaining its reasoning as follows:

> A petitioner seeking relief by way of habeas corpus has the burden of stating a prima facie case entitling him to relief. (In re Bower (1985) 38 Cal.3d 865, 872.) A petition for writ of habeas corpus should attach as exhibits all reasonably available documentary evidence or affidavits supporting the claim. (People v. Duvall (1995) 9 Cal.4th 464, 474.) The prosecution has the duty to disclose any exculpatory evidence to the defense. (PC § 1054.1(e); Brady v. Maryland (1963) 373 U.S. 83.) The prosecutor must disclose not only information in his possession, but he must "make diligent good faith efforts to obtain and make available to the defense pertinent information in the possession of other agencies which are parts of the criminal justice system." (Engstrom v. Superior Court (1971) 20 Cal.App.3d 240, 243-44.) The failure to disclose Brady evidence is only prejudicial if the evidence was "material" – meaning that there is a reasonable probability of a different result. (People v. Kasim (1997) 56 Cal.App.4th 1360, 1382.) Another manner of evaluating the prejudice is whether the failure to disclose resulted in a denial of a right to a fair trial or undermined confidence in the verdict. (Kyles v. Whitely (1995) 514 U.S. 419, 434.)
>
> Petitioner is incarcerated following a conviction for robbery with numerous prior convictions. He claims that the prosecutor violated Brady by failing to disclose exculpatory evidence, namely impeachment evidence for witness Laquanda McKinzey, and affirmatively denying that McKinzey had any adult or juvenile record that could be used to impeach her. Petitioner claims that McKinzey actually had a prior conviction and was on probation at the time she testified. However, Petitioner has provided no evidence to support his claim. While a letter attached to the petition suggests McKinzey was on probation, this is not admissible evidence. In addition, even if there was evidence to support Petitioner's claim, he has not shown that the evidence was "material" – there has been no showing of how McKinzey testified or how her impeachment might have affected the trial.

(Lodged Doc. 13 at 1.)

It is well established that "the suppression by prosecution of evidence that is favorable to an accused...violates due process where the evidence is material to either guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). *See also Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006) ("A *Brady* violation occurs when the government fails to disclose evidence materially favorable to the

33

accused.").  The *Brady* rule imposes upon the prosecution an affirmative duty to disclose both exculpatory and impeachment evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985), and is applicable even when there has been no discovery request by the accused.  *United States v. Agurs*, 427 U.S. 97, 107 (1976).  Moreover, the *Brady* rule applies to an agent acting on behalf of the prosecution and, therefore, constitutional error may occur even when exculpatory or impeachment evidence is known, for example, "only to police investigators and not to the prosecutor." *Youngblood*, 547 U.S. at 869-70.  *See also Kyles v. Whitley*, 514 U.S. 419, 438 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police.").

A *Brady* violation is threefold: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or  inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  *See also Banks v. Dretke*, 540 U.S. 668, 691 (2004) (reiterating the three part test set out in *Strickler*); *Silva v. Brown*, 416 F.3d 980, 985 (9th Cir. 2005) (same).  In order to establish prejudice, a petitioner must demonstrate "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 683.  *See Strickler*, 527 U.S. at 289 (In order to obtain relief, a petitioner "must convince us that 'there is a reasonable probability' that the result of the trial would have been different had the suppressed documents been disclosed to the defense").  "The question is not whether petitioner would more likely than not have received a different verdict with the evidence, but whether 'in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Strickler*, 527 U.S. at 289 (quoting *Kyles*, 514 U.S. at 434).  *See also Bagley*, 473 U.S. at 678 ("[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial."); *Silva*, 416 F.3d at 986 (establishing a *Brady* violation where "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence

in the verdict."). Once the materiality of the suppressed evidence is established, no further harmless error analysis is required. *Kyles*, 514 U.S. at 435-36. Thus, "[w]hen the government has suppressed material evidence favorable to the defendant, the conviction must be set aside." *Silva*, 416 F.3d at 986.

Petitioner presents no reliable evidence in support of his contention that McKenzie had a criminal record at the time of his trial. In fact, Petitioner offers materials which do not support his claim whatsoever: a document submitted by the prosecution to Petitioner which notes McKenzie's *absence* of a criminal record at the time of trial, and a page from the transcript of his trial in which the prosecutor informs the court that, according to his investigator, McKenzie has no criminal record. In addition, Petitioner offers his own declaration referencing an "attached letter." The declaration further notes, however, that the only copy of the letter was submitted to the Sacramento County Superior Court. Attached as an exhibit to Petitioner's January 20, 2004 petition for writ of habeas corpus in the state court is a letter written by Debra Foster to Petitioner containing the following statement:

> So basically even though [Laquanda's mother] told me Laquanda had a record and was on Probation prior to the day you, her, and Marcus were arrested at my house 5-11-00. She won't help you prove it, cause some non-legal related Civil Servant, CDC employer has told her she shouldn't. [ ] Ain't that Special?

(Lodged Doc. 13 at Ex. AA). This letter is undated, unsworn, unauthenticated, uncorroborated, and the circumstances under which it was written provide no indicia of reliability.

Petitioner cannot demonstrate the presence of a single required element of a *Brady* violation that would entitle him to federal habeas corpus relief. Petitioner's assertions that McKenzie had a criminal record, that the prosecution deliberately or inadvertantly failed to disclose that potentially impeaching information to Petitioner at the time of trial, and that he suffered any prejudice from the alleged failure to disclose are insufficient to establish a violation of *Brady*. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."). Moreover, under California law, a

witness may be impeached with a criminal record only in cases where the offense in question is one of "moral turpitude," and the trial court has "broad discretion" in determining whether to admit or exclude such evidence. *People v. Wheeler*, 4 Cal.4th 284, 295-96 (1992). Petitioner has not alleged that McKenzie's asserted criminal record consisted of infractions that would have been admissible under the California Evidence Code at trial for purposes of impeachment.   In sum, Petitioner has failed to demonstrate that the prosecutor at his trial withheld any materially favorable evidence or that there is a reasonable probability that the result of his trial would have been any different had the allegedly suppressed evidence been disclosed.  Petitioner is not entitled to federal habeas corpus relief on this claim.

## F.    LOSS OF MATERIAL EVIDENCE

Petitioner claims that the state of California and its agents violated his rights by negligently losing material evidence, specifically a gun-shaped lighter, alleged to have been used by Petitioner during the robbery.  According to Petitioner, the evidence was lost after it had been used by the prosecution during its case in chief, but prior to presentation of the defense's case. Petitioner argues that loss of this evidence denied him his federal right to due process of law because he was unable to effectively impeach the testimony of prosecution witness Egenhoff.  Specifically, Petitioner claims that the lost evidence interfered with his ability to present a complete defense and to "confront Victim Egganhoff [sic] with his inconsistent statements and descriptions" of the gun used in the robbery of the Greyhound Bus Depot.  (Traverse at 14).  According to Petitioner, Egenhoff's testimony describing the weapon was inconsistent with the description of the weapon Egenhoff gave to an investigating police officer following the robbery.

Petitioner raised this claim in both his March 27, 2001 petition for writ of mandate before the California Court of Appeal and in his May 16, 2001 petition for review before the California Supreme Court.  Both courts denied this claim without comment.  The state superior court rejected Petitioner's motion for a mistrial at trial based on the same argument, explaining its reasoning as follows:

THE COURT:    And I did read your papers. Your citations of the cases the Court did review, and you are correct, [the gun-shaped lighter] is material. And if it's necessary for impeachment, then there would be an issue that the Court would address regarding the process.

The Court did essentially address the similar arguments when this matter was raised when we initially discovered that that item - - or a couple of items of evidence did not make it from our other courtroom to this courtroom for whatever reason.

But in any event, the Court believes that you were not deprived of your ability to cross-examine [prosecution witness Egenhoff], for the reasons indicated by [the prosecutor], and that is, that the relevant testimony and exhibits of that weapon had been completed at the time Officer Hill testified. In other words, the jury viewed physically the weapon.

Mr. Egenhoff looked at it, handled it, and in fact, was the person who displayed it to the jury. And we had a photograph of it. And therefore, if you had recalled Mr. Egenhoff [to the witness stand], it was not necessary for you to place that weapon in his hands again. He had previously held it. He had previously testified he didn't know one gun from another.

And certainly didn't know to the effect, didn't have the ability to verbally describe the weapon. Revolver and an automatic were all the same to him. So the use of the word "revolver" was explained by him, to say that that word basically has no meaning to me, it just means a handgun, words to that effect. I'm not quoting his testimony.

And therefore, for the purposes of impeachment, could have been shown the photograph, and he could have been asked to recall the weapon - - or rather, the cigarette lighter that he had previously handled, looked at, and testified to. And further, at the time of his testimony, he not only had the physical object, he was also shown the photograph and was able to qualitatively describe the photograph versus the weapon.

37

So in the Court's view, because the cigarette lighter weapon was lost after the pertinent testimony, after that evidence and information was presented and preserved before the jury, that you were not deprived of the material evidence that prevented you from being able to engage in witness impeachment, and for those reasons, I don't believe there are any other issues or motions. Your motion for mistrial will be denied.

(Lodged Doc. 2 at 3346-3347).

Due process standards require that criminal defendants be afforded a meaningful opportunity to present a complete defense, including "what might loosely be called the area of constitutionally guaranteed access to evidence." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). A criminal defendant's due process rights are violated when the government fails to preserve evidence that possesses "exculpatory value that was apparent before the evidence was destroyed, and [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984).

In order to establish a constitutional violation, the defendant must demonstrate that the government acted in bad faith in failing to preserve the potentially useful information. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). Bad faith can be demonstrated where there is evidence in the record of "official animus towards [a defendant] or of a conscious effort to suppress exculpatory evidence." *Trombetta*, 467 at 488. "The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993) (citing *Youngblood*, 488 U.S. at 56-57).

Here, there is no dispute that the gun-shaped lighter was not preserved for use as evidence throughout the course of Petitioner's entire trial. However, the exculpatory value of the lighter as impeachment evidence should Egenhoff have been recalled as a witness was doubtful. Egenhoff had already been questioned extensively on direct examination by the prosecutor and on cross examination by Petitioner and counsel for Petitioner's co-defendant regarding his recollection

and description of the gun used in the robbery, including regarding the apparent discrepancies between his description of the gun and the gun-shaped lighter in evidence. In addition, Egenhoff was subjected to re-direct examination and re-cross examination several times. During Egenhoff's testimony, which occurred before the loss of the gun-shaped lighter, he was given the opportunity to hold and examine the gun-shaped lighter, to examine a photograph of the it, and to provide his own independent recollection and description of the "gun" used in the robbery. The jury was also given the opportunity to view the actual lighter during Egenhoff's testimony. Although the lighter was eventually lost, its photograph of the lighter remained in evidence. In light of these facts, Petitioner does not explain why the photograph of the lighter was not a comparable replacement or why it would have been an inadequate impeachment tool should Egenhoff be recalled as a witness.

Moreover, even assuming that, under the circumstances described above, the gun-shaped lighter would have been potentially useful, Petitioner does not allege, and the record does not contain, any evidence of bad faith on the part of the government in the loss of lighter during trial. For example, "[t]he record contains no allegation of official animus towards [Petitioner] or a conscious effort to suppress exculpatory evidence." *Trombetta*, 467 U.S. at 488. Absent evidence of bad faith on the part of the government, the "failure to preserve potentially useful evidence does not constitute a denial of due process . . . ." *Youngblood*, 488 U.S. at 58.

For all of these reasons, Petitioner is not entitled to habeas corpus relief on his loss of evidence claim.

## VI. CONCLUSION

IT IS RECOMMENDED that Petitioner's petition for writ of habeas corpus be denied. These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served

and filed within seven days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file, petitioner may address whether a certificate of appealability should issue in the event that he elects to file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: April 13, 2011

*Charlene H. Sorrentino*
_____
CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE